# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 05-136V
### (Not For Publication)

* * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| LAURA HOLT, Parent of A.H.T., a minor, | * | |
| | * | Filed: September 1, 2017 |
| Petitioner, | * | |
| | * | Decision on Attorneys' |
| v. | * | Fees and Costs |
| | * | |
| SECRETARY OF HEALTH AND HUMAN SERVICES | * | |
| | * | |
| Respondent. | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

*Andrew D. Downing, Van Cott & Talamante, PLLC, Phoenix, AZ, for Petitioners.*
*Alexis B. Babcock, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING ATTORNEYS' FEES AND COSTS

**HASTINGS, *Special Master*.**

In this case under the National Vaccine Injury Compensation Program (hereinafter "the Program"[1]), Laura Holt ("Petitioner") seeks, pursuant to 42 U.S.C. § 300aa-15(e)(1), an award for attorneys' fees and other costs incurred in attempting to obtain Program compensation. After careful consideration, I have determined to grant the request in substantial part, and deny it in part.

## I

## BACKGROUND LAW CONCERNING ATTORNEYS' FEES AND COSTS AWARDS

Special masters have the authority to award "reasonable" attorneys' fees and litigation costs in Vaccine Act cases. §300aa–15(e)(1). This is true even when a petitioner is unsuccessful

---

[1] The applicable statutory provisions defining the Program are found at 42 U.S.C. § 300aa-10 *et seq.* (2012 ed.). Hereinafter, for ease of citation, all "§" references will be to 42 U.S.C. (2012 ed.). The statutory provisions defining the Program are also sometimes referred to as the "Vaccine Act."

on the merits of the case -- in such cases, a special master "may" award fees, if the petition was filed in good faith and with a reasonable basis.  *Id*. "The determination of the amount of reasonable attorneys' fees is within the special master's discretion." *Saxton v. HHS*, 3 F.3d 1517, 1520 (Fed. Cir. 1993); *see also Shaw v. HHS*, 609 F.3d 1372, 1377 (Fed. Cir. 2010).

Whether a claim is brought in "good faith" is a *subjective* determination, long understood as requiring an "honest belief" that a claim is appropriate for compensation.  *See, e.g.*, *Chronister v. HHS*, No. 89-41V, 1990 WL 293438, at *1 (Fed. Cl. Spec. Mstr. Dec. 4, 1990).  The standard for finding good faith has been described as "very low," and findings that a petition lacked good faith are rare.  *Heath v. HHS*, No. 08-86V, 2001 WL 4433646, at *2 (Fed. Cl. Spec. Mstr. Aug. 25, 2011).  In fact, it has been said that petitioners are entitled to a presumption of good faith absent direct evidence of bad faith.  *Grice v. HHS*, 36 Fed. Cl. 114, 121 (1996).

The question of whether a claim has a "reasonable basis", on the other hand, is objective, and must be affirmatively established by the petitioner.  *McKellar v. HHS*, 101 Fed. Cl. 297, 303 (2011).  The claim of a "reasonable basis" must be supported by more than "unsupported speculation." *Perreira v. HHS*, 33 F.3d 1375, 1377 (Fed. Cir. 1994).  Rather, to have a reasonable basis, a claim must be supported, at a minimum, by medical records of medical opinion. *Chronister*, 1990 WL 293438, at *1.  Even though reasonable basis may exist at the time the petition is filed, it "may later come into question if new evidence becomes available or the lack of supporting evidence becomes apparent." *Chuisano v. HHS*, 116 Fed. Cl. 276, 288 (2014); *see also Perriera*, 33 F.3d at 1377 (affirming the special master's finding that reasonable basis existed until the evidentiary hearing); *Hamrick v. HHS*, No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007) (observing that "[p]etitioner's counsel must review periodically the evidence supporting petitioner's claim").

As to all aspects of a claim for attorneys' fees and costs, the burden is on the *petitioner* to demonstrate that the attorneys' fees claimed are "reasonable." *Sabella v. HHS*, 86 Fed. Cl. 201, 215 (2009); *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Rupert v. HHS*, 52 Fed. Cl. 684, 686 (2002); *Wilcox v. HHS*, No. 90-991V, 1997 WL 101572, at *4 (Fed. Cl. Spec. Mstr. Feb. 14, 1997).  The petitioner's burden of proof to demonstrate "reasonableness" applies equally to *costs* as well as attorneys' fees. *Perreira v. HHS*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994).

One test of the "reasonableness" of a fee or cost item is whether a hypothetical petitioner, who had to use his own resources to pay his attorney for Vaccine Act representation, would be willing to pay for such expenditure.  *Riggins v. HHS*, No. 99-382V, 2009 WL 3319818, at *3 (Fed. Cl. Spec. Mstr. June 15, 2009), *aff'd by unpublished order* (Fed. Cl. Dec. 10, 2009), *aff'd*, 406 Fed. App'x. 479 (Fed. Cir. 2011); *Sabella v. HHS*, No. 02-1627V, 2008 WL 4426040, at *28 (Fed. Cl. Spec. Mstr. Aug. 29, 2008), *aff'd in part and rev'd in part*, 86 Fed. Cl. 201 (2009).  In this regard, the United States Court of Appeals for the Federal Circuit has noted that:

> [i]n the private sector, 'billing judgment' is an important component in fee setting.  It is no less important here.  Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.

*Saxton*, 3 F.3d at 1521 (emphasis in original) (quoting *Hensley*, 461 U.S. at 433–34). Therefore, in assessing the number of hours reasonably expended by an attorney, the court must exclude those "hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434; *see also Riggins*, 2009 WL 3319818, at *4.

The Federal Circuit has also made clear that special masters may rely on their prior experience in making reasonable fee determinations, without conducting a line-by-line analysis of the fee bill, and are not required to rely on specific objections raised by respondent. *See Saxton*, 3 F.3d at 1521; *Sabella*, 86 Fed. Cl. at 209; *see also Wasson v. HHS*, 24 Cl. Ct. 482, 484, 486 (1991), *aff'd*, 988 F.2d 131 (Fed. Cir. 1993) (holding that, in determining a reasonable number of hours expended in any given case, a special master may rely on her experience with the Vaccine Act and its attorneys, without basing his decision on a line-by-line examination of the fee application). A unanimous Supreme Court has articulated a similar holding:

> We emphasize, as we have before, that the determination of fees "should not result in a second major litigation." The fee applicant (whether a plaintiff or a defendant) must, of course, submit appropriate documentation to meet "the burden of establishing entitlement to an award." But trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations, in light of "the district court's superior understanding of the litigation." We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it.

*Fox v. Vice*, 563 U.S. 826, 838 (2011) (internal citations omitted).

## II

## PROCEDURAL BACKGROUND

Petitioner filed a "short form" petition, used in the Omnibus Autism Proceeding ("OAP") to allege a causal relationship between one or more vaccines and a neurological disorder such as an autism spectrum disorder ("ASD"), on behalf of her daughter, A.H.T., on January 21, 2005.[2]

---

[2] By electing to file a Short-Form Autism Petition for Vaccine Compensation, Petitioner alleged that:

> As a direct result of one or more vaccinations covered under the National Vaccine Injury Compensation Program, the vaccinee in question has developed a neurodevelopmental disorder, consisting of an Autism Spectrum Disorder or a similar disorder. This disorder was caused by a measles-mumps-rubella (MMR) vaccination; by the "thimerosal" ingredient in certain Diphtheria-Tetanus-Pertussis (DTP), Diphtheria-Tetanus-acellular Pertussis (DTaP), hepatitis B, and Hemophilus Influenza Type B (Hib) vaccinations; or by some combination of the two.

By filing this "short form" petition, Petitioner opted into the OAP.[3]  Petitioner's case, along with others in the OAP, was stayed until the outcomes of the OAP "test cases" became final.[4]

After the final appellate decision in the OAP test cases was issued,[5] petitioners in OAP cases were ordered to inform the special master to whom their case was assigned whether they intended to proceed with their claim, either on a new theory of causation or with new evidence on one or both of the rejected causation theories.  Petitioner filed a motion to substitute her current attorney, Andrew Downing, for her former attorney, Ronald Homer of Conway, Homer, and Chin-Caplan on March 15, 2011.  (ECF No. 12.)  Interpreting the motion as an indication that Petitioner intended to pursue her claim, the special master to whom the case was assigned, Special Master Vowell, ordered Petitioner to file an amended petition.  (*See* Order, ECF No. 14, issued Apr. 5, 2011.)  In her amended petition, filed on September 22, 2011, Petitioner alleged that A.H.T. suffered an adverse reaction to the Hepatitis B vaccine she received on April 4, 2002, when five days old.   (ECF No. 19.)

During the subsequent eight-month period, Petitioner filed medical records (ECF Nos. 20, 22-23, 26-28, 31, 33, 35-36, 38, 41, 50-52), statements and medical literature (ECF Nos. 42, 46, 49, 53, 55), and expert reports, curriculum vitae, and medical literature from Dr. Andrew Levinson (ECF No. 39), Dr. Phillip DeMio (ECF No. 40), and Dr. Fran D. Kendall (ECF No. 56).  In these filings, Petitioner further refined her argument, alleging that A.H.T. had an underlying mitochondrial dysfunction, which was significantly aggravated by the Hepatitis B vaccine.  (*See, e.g.*, Petitioner's Post-Hearing Brief, ECF No. 86, filed May 9, 2013.)  As noted by Special Master Vowell in her entitlement Decision filed on June 24, 2015, Petitioner's new theory of causation followed a trend in many former OAP cases.  *See Holt v. HHS,* No. 05-136V, 2015 WL 4381588, at *2-3, 3 n.9 (Fed. Cl. Spec. Mstr. June 24, 2015).

On July 19, 2012, the Secretary of Health and Human Services ("Respondent") filed a "Rule 4 report" in opposition of Petitioner's claim (ECF No. 57), and expert reports, *curricula*

---

Autism General Order #1, 2002 WL 31696785, at *5 (Fed. Cl. Spec. Mstr. July 3, 2002).  This Order can also be found on the Master Autism Petition for Vaccine Compensation on the court's website at http://www.uscfc.uscourts.gov/sites/default/files/autism/Autism+General+Order1.pdf.

[3] I set forth a detailed discussion of the controversy regarding vaccines and autism and the development of the OAP to address the 5,000 cases in this Court in my Decision in *King,* one of the test cases.  *See King v. HHS*, No. 03-584V, 2010 WL 892296, at *5-12 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

[4] The Petitioners' Steering Committee, an organization formed by attorneys representing petitioners in the OAP, litigated six test cases presenting two different theories on the causation of ASDs.  Decisions in all six cases rejected petitioners' causation theories.  The Theory 1 cases are *Cedillo v. HHS*, No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 89 Fed. Cl. 158 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010); *Snyder v. HHS*, No. 01-162V, 2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 88 Fed. Cl. 706 (2009); *Hazelhurst v. HHS*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 88 Fed. Cl. 473 (2009), *aff'd*, 604 F.3d 1343 (Fed. Cir. 2010).  Petitioners in *Snyder* did not appeal the decision of the U.S. Court of Federal Claims.  The Theory 2 cases are *Mead v. HHS*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010), *Dwyer v. HHS*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *King*, 2010 WL 892296.  The petitioners in all three Theory 2 cases chose not to appeal.

[5] *See Cedillo v. HHS*, 617 F.3d 1328 (Fed. Cir. 2010).

*vitae*, and medical literature from Dr. Max Wiznitzer (ECF No. 58) and Dr. Shawn McCandless (ECF No. 59). An evidentiary hearing was conducted by Special Master Vowell on February 13-15, 2013. (*See* ECF No. 61.) All experts except for Dr. Levinson testified at the hearing. *See Holt*, 2015 WL 4381588, at *4. Initially, Dr. Levinson was to testify at the hearing by telephone, but was not reachable when called. (*See* Petitioner's Pre-Hearing Submission and Witness and Exhibit List, ECF No. 66, filed Jan. 22, 2013, p. 9; Transcript or Proceedings ("TR"), ECF Nos. 78, 80, 82, pp. 284, 290.)

On March 8, 2013, the parties filed a Stipulation of Facts Regarding Interim Attorneys' Fees and Costs ("Stipulation"). (ECF No. 72.) Petitioner initially requested attorneys' fees and costs incurred through February 22, 2013, by Mr. Downing in the amount of $135,957.22 and by Petitioner's former law firm, Conway, Homer, and Chin-Caplan in the amount of $3,730.00. (*Id.*, ¶ 4.) The only amounts reserved for later consideration were the costs for Dr. Kendall's airfare, hotel, and meals during the hearing and for Dr. DeMio's time and expenses related to the hearing. (*Id.*, ¶ 4 n.1.) After informal discussions, Petitioner agreed to reduce the amount requested to $120,000.00 for attorneys' fees and costs for Mr. Downing, except for the costs specifically reserved for later consideration, and $3,730.00 for Conway, Homer, and Chin-Caplan. (*Id.*, ¶ 6.) Based upon the parties' Stipulation, Special Master Vowell awarded $123,730.00 in interim attorneys' fees and costs. *See Holt v. HHS*, No. 05-136V, 2013 WL 1339078 (Fed. Cl. Spec. Mstr. Mar. 8, 2013).

After interim fees were awarded, Petitioner filed videotape of A.H.T. from birth to three years of age. (ECF No. 84.) The parties filed briefs setting forth their arguments and additional evidence addressing the Court's Exhibit I. (ECF Nos. 90-92.) A Decision was issued by Special Master Vowell denying compensation. *See Holt*, 2015 WL 4381588. Petitioner filed a Motion for Review of that decision on July 23, 2015. (ECF No. 98.)

Due to the impending retirement of Special Master Vowell, the case was reassigned to me while awaiting decision on the Motion for Review by the United States Court of Federal Claims ("Court of Federal Claims"). (ECF No. 102.) On May 5, 2017, Judge Thomas Wheeler denied Petitioner's motion. *See Holt v. HHS*, No. 05-136V (Fed. Cl. May 5, 2017) (ECF No. 113.)

On July 7, 2017, Petitioner filed an application for final attorneys' fees and costs ("Application"), requesting $30,790.50 for attorneys' fees, and $24,715.11 for attorneys' costs, for a total amount of $55,505.61 for attorneys' fees and costs. (ECF No. 117.) These amounts are in addition to the $123,730.00 in interim attorneys' fees and costs already awarded. On July 20, 2017, Respondent filed a Response to Petitioner's Application, recommending "that the special master exercise his discretion and determine a reasonable award for attorneys' fees and costs." (ECF No. 118, p. 3.) On August 28, 2017, Petitioner filed an Unopposed Motion to Amend Application for Final Attorney's Fees and Costs, requesting an additional $223.85 for Petitioner's out-of-pocket expenses. (ECF No. 120.)

# III

## REASONABLE BASIS AND GOOD FAITH

Implicit in her March 2013 Decision, awarding interim attorneys' fees and costs, is Special Master Vowell's finding that Petitioner's claim possessed the requisite good faith and reasonable basis until that time.[6] I agree with her assessment. However, reasonable basis which exists at the beginning of a case may cease to exist as the case progresses. *See Chuisano*, 116 Fed. Cl. at 288-89. Since Petitioner was unsuccessful before Special Master Vowell, I must determine if the reasonable basis which existed through the February 2013 hearing continued for the remainder of the proceeding, to include Petitioner's subsequent appeal.

Following the evidentiary hearing and interim award, Petitioner filed videotapes of A.H.T. from birth to age three years, and the parties set forth their arguments in post-hearings briefs and other filings. In her Decision, Special Master Vowell found numerous instances in which Petitioner's evidence was lacking. *See Holt*, 2015 WL 4381588. She never suggested, however, that a closer examination of the reasonable basis for Petitioner's claim was warranted.

Petitioner then filed a Motion for Review, arguing that Special Master Vowell disregarded evidence when making certain factual findings, and failed to properly credit the opinions of Dr. Levinson and Dr. DeMio, who treated A.H.T. several years after the events in question. (ECF No. 98, p. 2.) Although Judge Wheeler found Petitioner's arguments unpersuasive, he did not characterize them as frivolous, or suggest at any time that Petitioner's counsel should not be paid for his work.

It has been stated that a petitioner's degree of success when seeking review should not be considered when determining if an award of attorneys' fees and costs for any appellate work is warranted. *See Masias v. HHS,* 106 Fed. Cl. 700 (2012). However, a petitioner is not automatically entitled to such an award. *See Rodriguez v. HHS,* No. 06-559V, 2013 WL 1189451 (Fed. Cl. Spec. Mstr. Mar. 1, 2013).

Despite Special Master Vowell's extremely thorough treatment of this claim, Petitioner is entitled to seek review as long as she continues to possess a reasonable basis to pursue her claim. In this case, Petitioner laid out specific challenges to Special Master Vowell's findings and conclusions. (*See* Motion for Review, ECF No. 98, p. 2.) Like Judge Wheeler, I find no merit in Petitioner's arguments. Nevertheless, the challenges were reasonable enough to merit an award of attorneys' fees and costs.

In light of the written opinions of Judge Wheeler and Special Master Vowell and my own assessment of the evidence in this case, I find that Petitioner *did* have a reasonable basis to continue litigating this case up to the Court of Federal Claims.

---

[6] Because a petitioner seeking an interim award of attorneys' fees and costs cannot be definitively categorized as successful or not, a special master must be satisfied that the good faith and reasonable basis required under the Vaccine Act for unsuccessful claimants exists. *See* §300aa–15(e)(1) (requiring the special master to determine "that the petition was brought in good faith and there was a reasonable basis for the claim").

# IV

# ATTORNEYS' FEES

Reasonable attorneys' fees are calculated by multiplying a reasonable hourly rate by a reasonable number of hours expended on litigation, the lodestar approach. *Avera v. HHS*, 515 F.3d 1343, 1347-48 (Fed. Cir. 2008) (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)); *Saxton*, 3 F.3d at 1521. Only the hours "reasonably expended on the litigation" should be counted. Sabella, 86 Fed. Cl. at 204-05 (quoting *Hensley,* 461 U.S. at 433). A petitioner's counsel in the Vaccine Program is paid the forum rate unless the bulk of the work is performed in a locale other than the forum (District of Columbia) and the local rate is very significantly lower than the forum rate. *Avera*, 515 F.3d at 1349. If these two requirements are met, the *Davis* exception applies, and petitioner's counsel is paid according to the local rate. *Id.*; *see Davis County Solid Waste Management and Energy Recovery Special Service District v. United States Environmental Protection Agency*, 169 F.3d 755 (D.C. Cir. 1999).

Petitioner's interim fee award in this case encompassed the time period ending on February 22, 2013, the date Petitioner's counsel sought an interim award of attorneys' fees and costs. (*See* Stipulation, ECF No. 72, ¶ 4.) From that date until the present, Mr. Downing has been associated with three different law firms:  1) Rhodes, Hieronymus, Jones, Tucker & Gable, PLLC ("Rhodes") in Tulsa, Oklahoma; 2) Hennelly & Steadman, PLC ("Hennelly") in Phoenix, Arizona; and 3) Van Cott & Talamante, PLLC ("Van Cott") also in Phoenix, Arizona. The Application for final attorneys' fees covers legal work performed by Mr. Downing and other attorneys and paralegals at these three law firms. (Application, Ex. A, ECF No. 117-1.)

## A. *Analysis of Appropriate Hourly Rates for Petitioner's Counsel*

### 1. *Mr. Downing's Hourly Rate*

Mr. Downing's billing record seeks the following hourly rates:

1.   $295 for work performed in early 2013 while at the Rhodes law firm;
2.   $350 for work performed from early May 2013 through the end of 2016 while at the Hennelly and Van Cott law firms; and
3.   $375 for work performed in 2017 while at Van Cott, Mr. Downing's current law firm.

Appropriate forum rates for work performed in the Vaccine Program, which have been endorsed by all current special masters, were set forth by Special Master Gowan in a comprehensive decision, *McCulloch v. HHS*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). Following the tiered ranges of appropriate forum rates based on levels of experience which were established in *McCulloch*, a suggested fee schedule was posted on the court's website,[7] setting the following rates for 2015 to 2016:

---

[7] *See* http://www.uscfc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule2015-2016.pdf (last visited on Aug. 19, 2017) (for the OSM's 2015-16 Fee Schedule); *see also McCulloch*, 2015 WL 5634323, at *16-19 (for a description of the process employed when setting these ranges of hourly rates).

Attorneys with:

| | |
|---|---|
| 31+ years of experience in practice | $385-$430 |
| 20 – 30 years of experience in practice | $350-$415 |
| 11 – 19 years of experience in practice | $300-$375 |
| 8 – 10 years of experience in practice | $275-$350 |
| 4 – 7 years of experience in practice | $225-$300 |
| Less than 4 years of experience in practice | $150-$225 |
| Paralegals | $125-$145 |

Since Mr. Downing has been practicing law for 23 years, the hourly rate of $350 requested for his work from May 2013 to 2016 falls within the ranges appropriate for his level of experience.[8]  Shortly after *McCulloch*, this rate was approved for work performed in 2015 to 2016, but reduced slightly for the preceding two years.  *Al-Uffi v. HHS*, No. 13-956V, 2015 WL 6181669, at *10-11 (Fed. Cl. Spec. Mstr. Sept. 30, 2015) (awarding $342 for 2013, $348 for 2014, and $350 for 2015).  Since then, the hourly rate of $350 for work performed in 2014 to 2016 has been accepted and continually awarded in several cases.  *See, e.g.*, *Abbott v. HHS*, No. 14-907V, 2016 WL 4151689 (Fed. Cl. Spec. Mstr. July 15, 2016); *Semanisin v. HHS*, No. 15-1395V, 2017 WL 1398567 (Fed. Cl. Spec. Mstr. Mar. 21, 2017); *Bognar v. HHS*, No. 16-726V, 2017 WL 1376437 (Fed. Cl. Spec. Mstr. Mar. 22, 2017); *Bales v. HHS*, No. 15-882V, 2017 WL 2243094 (Fed. Cl. Spec. Mstr. Apr. 26, 2017); *Bourche v. HHS*, No. 15-232V, 2017 WL 2480936 (Fed. Cl. Spec. Mstr. May 11, 2017).  I agree and find this hourly rate to be reasonable for work performed while at the Hennelly and Van Cott law firms in Phoenix, Arizona from May 2013 through 2016.

Mr. Downing's billing record seeks an hourly rate of $295 for work performed in early 2013 while at the Rhodes law firm in Tulsa, Oklahoma.  This rate is consistent with the rates for which Respondent argued in *Al-Uffi*.  2015 WL 6181669, at *10.  Presumably, Mr. Downing was routinely paid attorneys' fees at this rate prior to the issuance of *McCulloch* and his move to Phoenix, Arizona.  The hourly rate of $295 is appropriate for this work.

With regard to the hourly rate of $375 sought by Mr. Downing for work performed in 2017, I find the proposed rate to be excessive.  Mr. Downing's experience falls into the group of attorneys with 20 to 30 years under *McCulloch's* range of hourly rates.  The range for these attorneys in 2016 is between $350 and $415.  However, as Special Master Moran noted, Mr. Downing's 2017 hourly rate of $375 per hour would afford him an increase of $25 from his 2016 hourly rate of $350.  *See Bourche*, 2017 WL 2480936, at *4.  Special Master Moran further referenced the Producer Price Index for the "Office of Lawyers" category ("PPI-OL"), provided by the Department of Labor, Bureau of Labor Statistics, as being suitable for increasing an attorneys' hourly rate.  *See id.* (citing *Williams v. Johnson*, 174 F.Supp.3d 336, 343 (D.D.C. 2016).  I agree with Special Master Moran.

---

[8] For work performed in 2014 to 2016, Mr. Downing's level of experience places him in the range for attorneys with 20 to 30 years of experience.  Mr. Downing's level of experience during 2013 places him in the range for attorneys' with 11 to 19 years of experience.  The hourly rate of $350 is an appropriate hourly rate under either category.

Based on the PPI-OL, a 2.25% rate of increase between 2016 and 2017 would provide $358 as a reasonable hourly rate for work performed by Mr. Downing in 2017. *Bourche,* 2017 WL 2480936, at *4. Further, applying this rate of increase to the rates set forth in *McCulloch* results in an hourly rate range for attorneys with 20 to 30 years of experience in 2017 that is between $358 and $424 per hour.[9] I find Special Master Moran's analysis in *Bourche* to be persuasive, and agree that $365 is a reasonable hourly rate for Mr. Downing for work performed in 2017. 2017 WL 2480936, at *4. Since Mr. Downing only requests 3.2 hours for work performed that year, the resulting adjustment in attorneys' fees for Mr. Downing is small. (ECF No. 117-1, p. 6.)

*Petitioner's award is reduced by $32.00.*

### 2. Hourly Rates for Other Attorneys and Paralegals

Petitioner's final fee Application also covers work performed by other attorneys and a paralegal at the Rhodes and Van Cott law firms. (ECF No. 117-1, pp. 3-6, 29-30.) Citing numerous cases, Petitioner argues that the hourly rates charged by individuals working at the Van Cott firm have been found to be reasonable. (ECF No. 117, p. 2.) Petitioner is correct that the rate of $195 for Justin Redman's work and $100 for paralegal Danielle Avery's work in 2015 to 2016 has been accepted and awarded in multiple cases. *See, e.g., Abbott,* 2016 WL 4151689, at *5; *Anderson v. HHS,* No. 14-879V, 2012 WL 4169107, at *3 (Fed. Cl. Spec. Mstr. June 28, 2016; *Laney v. HHS,* No. 14-984V, 2016 WL 7030744, at *6 (Fed. Cl. Spec. Mstr. Oct. 18, 2016); *Bourche,* 2017 WL 2480936, at *4. None of the cases cited by Petitioner, however, addressed the increased rate requested for Ms. Avery's work in 2017. *See, e.g., Anderson,* 2012 WL 4169107, at *3; *Laney*, 2016 WL 7030744, at *6.

Ms. Avery's work in 2017 is billed at a rate of $135, the same rate awarded for the paralegals' work in *McCulloch.* That rate, described as a high rate for paralegal work, was awarded in *McCulloch* because the paralegals in that case had earned college degrees and had worked primarily on vaccine cases for several years. 2015 WL 5634323, at *21. In *Semanisin,* Special Master Gowan declined to award this higher rate for work performed by Ms. Avery in 2017, because the petitioner in that case failed to produce evidence showing Ms. Avery had the advanced expertise of the paralegals in *McCulloch. Semanisin,* 2017 WL 1398567, at *3. Instead, Special Master Gowan reduced Ms. Avery's 2017 rate to $110. (*Id.*) However, he later awarded $135 in another case, reasoning that Ms. Avery had gained experience and noting that $135 is within the range for paralegal rates envisioned in *McCulloch. Bales*, 2017 WL 2243094, at *4. The range for paralegals in the 2017 fee schedule which is posted on the court's website is $128-$148.

In this case, Petitioner has not provided evidence to show Ms. Avery possesses additional expertise such as a college degree. As Special Master Gowan noted, however, she is gaining greater experience in this specialized area of law. Additionally, $135 is in the lower half of the range specified for 2017. Thus, I find $135 to be an appropriate rate for Ms. Avery's work in 2017.

---

[9] *See* http://www.uscfc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule-2017.pdf (last visited on Aug. 19, 2017) (OSM's 2017 Fee Schedule).

While Mr. Downing was at the Rhodes law firm in Tulsa, Oklahoma, attorney Denelda L. Richardson performed .1 hours of work, billed at an hourly rate of $220, in this case.  (*See* ECF No. 117-1, pp. 29-30.)  Ms. Richardson appears to have nine years of legal experience.  I find $220 to be an appropriate hourly rate.

### B. Attorney Time

Under the lodestar approach, I also must determine if the amount of hours billed are reasonable.  *See Sabella,* 86 Fed. Cl. at 204 *(*citing *Avera,* 515 F.3d at 1347-48).  A review of Mr. Downing's billing records shows this to be true in all cases but one.  I will not award attorneys' fees for the one hour of time Mr. Downing spent on February 19, 2013, while at the Rhodes law firm, compiling expense and fee information for Petitioner's interim fee application.  (ECF No. 117-1, p. 29.)  This time is covered under the Stipulation and March 8, 2013 award of interim attorneys' fees and should have been included in that request and subsequent negotiations.

*Petitioner's award is reduced by $295.00.*

# V

# ATTORNEYS' COSTS

### A. Amounts Covered Under the Interim Fee Application

Mr. Downing's billing record submitted with the final fees Application also includes costs which should have been included in Petitioner's request for an interim award.  According to the parties' Stipulation, the only expenses incurred prior to Petitioner's Application on February 22, 2013, which were not covered by the parties' negotiations and included in their agreement were Dr. Kendall's expenses (specifically "airfare, hotel, and meal expenses") and Dr. DeMio's fees and expenses related to the evidentiary hearing in February 2013.  (*See* Stipulation, ECF No. 72, ¶ 4 & ¶ 4 n.1.)  Included in this fee Application is $5,000.00 for Dr. Kendall's

testimony,[10] $1,500.00 for an expert retainer fee incurred in 2011,[11] and $2,350.00 for work performed by an unknown expert, presumably Dr. Levinson, from February 6 to 14, 2013.[12]

I do not know whether Petitioner failed to include these costs in his interim application, or has included them a second time in this request.  In either case, the parties formulized an agreement in 2013, which covered all fees and costs incurred prior to February 22, 2013, with only three exceptions.  Under this agreement, the total requested by Petitioner for interim fees and costs for Mr. Downing was reduced from $135,957.22 to $120,000.00.  (Stipulation, ECF No. 72, ¶¶ 4, 6.)  Based on the Stipulation, the amount of $120,000.00 was awarded.

The amounts listed above do not fall under any of the exceptions noted in the Stipulation. I will not alter the parties' earlier agreement by awarding such amounts now.

*Petitioner's award is reduced by $8,850.00.*

### B. *Fees and Expenses related to Dr. DeMio*

Under the parties' Stipulation, Dr. De Mio's fees and expenses related to the evidentiary hearing in February 2013, were specifically reserved for later consideration.  Mr. Downing's billing record shows that Petitioner is requesting $2,267.38 for expenses and $10,560.00 for fees, totaling $12,827.38.  (ECF No. 117-1, pp. 16, 26.)  The $10,560.00 for Dr. DeMio's fee is based upon 32 hours of work billed at a rate of $330 per hour.  (*Id.*, p. 27.)

Highly critical of Dr. DeMio's testimony, Special Master Vowell described it as "involv[ing] broad, general statements, even when discussing his own treatment of A.H.T."

---

[10] The invoice provided by Dr. Kendall for the $5,000.00 charged for her testimony shows entries dated February 7 to 15, 2013.  (ECF No. 117-1, p. 15.)  The phone conference and trial preparation performed on February 7-8, 2013, are billed at an hourly rate of $350.  (*Id.*, p. 15.)  For her appearance at the hearing on February 13-15, 2013, Dr. Kendall has charged a daily rate of $1,000.00.  Without explanation, the invoice lists a partial appearance (.25 of a day) billed at a daily rate of $4,500.00 for the day before the hearing, February 12, 2013.  (*Id.*)  Because pre-approval of Dr. Kendall's fee agreement was requested but denied in another vaccine case, *Anderson v. HHS*, No. 02-1314V, I can surmise this time described as a court appearance is instead, Dr. Kendall's time spent traveling to the hearing in Washington, D.C.

As with attorneys' fees, the lodestar approach should be used to calculate the appropriate amount of expert costs.  *See, e.g., Gonzalez v. HHS,* No. 14-1072V, 2015 WL 10435023, at *16 (Fed. Cl. Spec. Mstr. Nov. 10, 2015). Additionally, it is well established that attorney time spent traveling when no substantive work is being performed is paid at ½ the attorneys' usual hourly rate.  *See Hocraffer v. HHS,* No. 99-533V, 2011 WL 3705153, at *24 (Fed. Cl. Spec. Mstr. July 25, 2011).  Thus, Dr. Kendall's use of a daily rate, of $1,000 for hearing appearances and $4,500 would not be appropriate if the amount was awarded.  Since I am deducting these amounts, I need not discuss the issue further.

[11] To support this charge, Petitioner has submitted the "Expert Services Agreement" from American Medical Experts, LLC.  (ECF No. 117-1, pp. 32-33.)  The agreement requires a deposit of $1,500.00 and was signed by Mr. Downing on October 25, 2011 while at the Rhodes law firm.  (*Id.*)

[12] The invoice provided is from "Vitality Health & Wellness."  (ECF No. 117-1, p. 35.)  It is dated February 21, 2013, and describes a review performed on February 8, 2013, and conferences, lasting at least an hour, on February 6, 11, and 14.  (*Id.*)

*Holt,* 2015 WL 4381588, at *17. She noted that Dr. DeMio "used medical terminology vaguely and indiscriminately" and concluded that his testimony was not helpful. (*Id.*) Special Master Moran similarly criticized an expert report from Dr. DeMio in another case, reducing his fee in by more than 50% and warning the attorney in that case that he "is highly unlikely to award any compensation for work Dr. DeMio performs after the date of [that] decision." *Dia v. HHS,* No. 14-954V, 2017 WL 2644695, at *4 (Fed. Cl. Spec. Mstr. May 25, 2017). Still, the hourly rate requested for Dr. DeMio's testimony in this case, $330, is not unreasonable, and I will compensate Dr. DeMio's time at that rate.

To support the number of hours claimed, Petitioner included a letter from Dr. DeMio, stating that he expended 2 hours preparing for the hearing and 30 hours appearing at the hearing on February 12 (6 hours) and February 13-15 (8 hours each day). (ECF No. 117-1, p. 27.) No further description of Dr. DeMio's time is provided. Petitioner also included Dr. DeMio's receipts for airfare, hotel, transportation, and food. (*Id.*, pp. 17-25.) For food, it appears that Dr. DeMio purchased items which he consumed all three hearing days at a grocery store near his hotel. (*Id.*, p. 25.) This amount is reasonable and will be paid.

As the transcript indicates, the hearing concluded at noon on February 15, 2013. TR. at 693. Included in Dr. DeMio's expenses is a flight change fee of $75.00, presumably for an earlier flight home on February 15, 2017. (ECF No. 117-1, p. 23.) I will pay that charge but will deduct 4 hours from Dr. DeMio's time since the hearing did not last the entire day on February 15, 2013.

*Petitioner's award is reduced by $1,320.00.*

## C. Expenses related to Dr. Kendall

Under the parties' Stipulation, Dr. Kendall's expenses related to the evidentiary hearing were specifically reserved for later consideration. To support the amount requested, $2,314.21, Petitioner has included an invoice from Dr. Kendall, showing that the $106.02 was for food and the remaining $2,208.19 was expended on "Travel & Lodging." (ECF No. 117-1, p. 14.) Petitioner has not provided any receipts.

"It is petitioners' burden to substantiate costs expended with supporting documentation such as receipts, invoices, canceled checks, etc." *Ceballos v. HHS,* No. 99-97V, 2004 WL 784910, at *13 (Fed. Cl. Spec. Mstr. Mar. 25, 2004). Special masters, however, have awarded compensation for costs without documentation when "satisfied that the costs incurred were related to the proceedings . . . and were reasonable." *Erickson v. HHS,* No. 96-361V, 1999 WL 1268149, at *8 (Fed. Cl. Spec. Mstr. Dec. 10, 1999); *see also Ceballos,* 2004 WL 784910, at *13.

The costs sought for Dr. Kendall's lodging, travel, and food are slightly higher, but still similar overall, to those sought for Dr. DeMio's expenses for which receipts were provided. (*See* ECF No. 117-1, pp. 16-25.) Therefore, I find them to be reasonable. However, Dr. Kendall should provide receipts for such costs in the future.

### D. Remaining Costs

The remaining costs sought by Petitioner total less than $1,000.00, with the largest amounts being for legal research. (ECF No. 117-1, pp. 5, 12, 30-31.) Receipts are included for most of these costs, and I am satisfied that all are reasonable.

# VI

## PETITIONER'S COSTS

In an amended motion, filed on August 28, 2017, Petitioner requests an additional $223.85 for her out-of-pocket expenses. These costs are for costs of copying medical records in 2011 to 2012, and a baggage fee of $50.00 incurred on February 12, 2013. (ECF No. 120-1, p. 1.) Receipts have been provided for all costs.

The Stipulation filed by the parties in March 2013 did not cover out-of-pocket costs incurred by Petitioner. I find these costs to be reasonable, and will reimburse them all.

# VII

## CALCULATION OF AWARD

I award attorneys' fees at all requested hourly rates, except for the rate sought by Mr. Downing for work performed in 2017. I reduce that hourly rate from $375 to $365. Additionally, I decline to award attorneys' fees or costs incurred during the time period covered by the parties' earlier Stipulation which were not specifically excluded under that agreement. I also reduce the hours claimed for work performed by Dr. DeMio related to the hearing by 4 hours since the hearing ended at noon on February 15, 2013.

I award the following amounts:

### Rhodes Law Firm:

Attorneys' Fees:

| Individual: | Year: | Hourly Rate: | Hours Requested: | Hours Awarded: | Amount Awarded: |
|---|---|---|---|---|---|
| Mr. Downing | 2013-14 | $295 | 12.9[13] | 11.9 | $3,510.50 |
| Ms. Richardson | | $220 | .1 | .1 | $22.00 |
| **Total Fees:** | | | | | **$3,532.50** |

---

[13] It appears that the total time for Mr. Downing's work was erroneously totaled as 12.9 instead of 13 hours. (*See* ECF No. 117-1, pp. 29-30.) I will use the total listed in the billing record, 12.9 hours, reducing it by 1 hour to 11.9 hours.

**Total Costs:**                                                                    **$285.28**


**Hennelly Law Firm:**

Attorneys' Fees:

| Individual: | Year: | Hourly Rate: | Hours Requested: | Hours Awarded: | Amount Awarded: |
|---|---|---|---|---|---|
| Mr. Downing | 2013-14 | $350 | 33.1 | 33.1 | $11,585.00 |
| **Total Fees:** | | | | | **$11,585.00** |

Costs:

| | |
|---|---|
| Dr. Kendall's Expenses | $2,314.21 |
| Dr. DeMio's Expenses | $2,267.38 |
| Dr. DeMio's Fee | $9,240.00 |
| Other Costs | $21.80 |
| **Total Costs:** | **$13,843.39** |


**Van Cott Law Firm:**

Attorneys' Fees:

| Individual: | Year: | Hourly Rate: | Hours Requested: | Hours Awarded: | Amount Awarded: |
|---|---|---|---|---|---|
| Mr. Downing | 2014-16 | $350 | 23.5 | 23.5 | $8,225.00 |
| | 2017 | $365 | 3.2 | 3.2 | $1,168.00 |
| Mr. Redman | 2015 | $195 | 29.1 | 29.1 | $5,674.50 |
| Ms. Avery | 2014-16 | $100 | 1.3 | 1.3 | $130.00 |
| | 2017 | $135 | 1.1 | 1.1 | $148.50 |
| **Total Fees:** | | | | | **$15,346.00** |


**Total Costs:**                                                                    **$416.44**


**Petitioner's Out-of-Pocket Expenses:**                                            **$223.85**

The overall totals awarded are **$30,463.50** for attorneys' fees, **$14,545.11** for attorneys' costs, and **$223.85** for Petitioner's out-of-pocket expenses for a total award of **$45,232.46.**

## VIII

## NOTATION CONCERNING "REASONABLE BASIS" IN AUTISM CASES IN GENERAL

In the early 2000s, controversies arose concerning whether autism spectrum disorders might be caused or affected by vaccines. Thus, thousands of Vaccine Act claims were filed during those years alleging that ASDs were vaccine-caused.[14] These claims were certainly brought in good faith. Further, in light of the scientific uncertainty at the time, I found that the *filing* of those petitions was reasonable. It was also reasonable to keep such claims pending until the OAP "test cases" became final in 2010, and for some short period of time thereafter, in order for counsel for each petitioner to digest the complicated science, and to consult with experts to see if a reasonable basis to go forward could be found.

However, by the end of 2010, the two major theories concerning vaccine-causation of autism had been thoroughly considered and rejected in the OAP test cases, with opinions that, among other things, found that *all* of the many reputable epidemiological studies had found *no association* between any vaccines and autism. At that point, the vast majority of the approximately 5,000 autism petitioners each elected either to withdraw their claim, or to request that the special master enter a decision denying their claim on the written record. Only a small minority of the autism petitioners elected to continue to pursue their cases, seeking other causation theories and/or other expert witnesses. Since 2010, a number of such cases, including this case, have gone to trial before special masters, and in the cases of this type decided thus far, *all* have resulted in *rejection* of petitioners' claims that vaccines played a role in causing or aggravating their child's autism or autistic symptoms.[15]

---

[14] A detailed discussion of the history of the controversy regarding vaccines and autism, the OAP, and the "test case" litigation can be found in the test cases cited earlier in this Decision. *See Supra* note 4. A summary can be found in many of my more recently issued decisions. *See, e.g., Hooker v. HHS,* No. 02-472V, 2017 WL 3033940, at *4-5 (Fed. Cl. Spec. Mstr. Apr. 11, 2017).

[15] *See, e.g., Henderson v. HHS*, No. 09-616V, 2012 WL 5194060 (Fed. Cl. Spec. Mstr. Vowell Sept. 28, 2012) (autism not caused by pneumococcal vaccination); *Blake v. HHS*, No. 03-31V, 2014 WL 2769979 (Fed. Cl. Spec. Mstr. Vowell May 21, 2014) (autism not caused by MMR vaccination); *Murphy v. HHS*, No. 05-1063V, 2016 WL 3034047 (Fed. Cl. Spec. Mstr. Corcoran Apr. 25, 2016) (autism not caused by DTaP or MMR vaccines), *aff'd*, 2016 WL 4926207 (Fed. Cl. Aug. 15, 2016); *Franklin v. HHS*, No. 99-855V, 2013 WL 3755954 (Fed. Cl. Spec. Mstr. Hastings May 16, 2013) (MMR and other vaccines found not to contribute to autism); *Coombs v. HHS*, No. 08-818V, 2014 WL 1677584 (Fed. Cl. Spec. Mstr. Hastings Apr. 8, 2014) (autism not caused by MMR or Varivax vaccines); *Long v. HHS*, No. 08-792V, 2015 WL 1011740 (Fed. Cl. Spec. Mstr. Hastings Feb. 19, 2015) (autism not caused by influenza vaccine); *Brook v. HHS*, No. 04-405V, 2015 WL 3799646 (Fed. Cl. Spec. Mstr. Hastings May 14, 2015) (autism not caused by MMR or Varivax vaccines); *Holt*, 2015 WL 4381588 (autism not caused by hepatitis B vaccine), *aff'd, Holt v. HHS,* No. 05-136V (Fed. Cl. May 5, 2017); *Lehner v. HHS*, No. 08-554V, 2015 WL 5443461 (Fed. Cl. Spec. Mstr. Vowell July 22, 2015) (autism not caused by influenza vaccine); *Miller v. HHS*, No. 02-235V, 2015 WL 5456093 (Fed. Cl. Spec. Mstr. Vowell August 18, 2015) (ASD not caused by combination of vaccines); *Allen v HHS*, No. 02-1237V, 2015 WL 6160215 (Fed. Cl. Spec. Mstr. Vowell Sept. 26, 2015) (autism not caused by MMR vaccination); *R.K. v. HHS*, No. 03-632V, 2015 WL 10936124 (Fed. Cl. Spec. Mstr. Vowell Sept. 28, 2015) (autism not caused by influenza vaccine), *aff'd*, 125 Fed. Cl. 57 (2016), *aff'd*, 2016 WL 7174139 (Fed. Cir. Dec. 9, 2016); *Hardy v. HHS*, No. 08-108V, 2015 WL 7732603 (Fed. Cl. Spec. Mstr. Hastings Nov. 3, 2015) (autism not caused by several vaccines); *Sturdivant v. HHS*, No. 07-788V, 2016 WL 552529 (Fed. Cl. Spec. Mstr. Hastings Jan. 21, 2016) (autism not caused by Hib and Prevnar vaccines); *R.V. v. HHS,* No. 08-504V, 2016 WL 3882519 (Fed. Cl. Spec. Mstr. Corcoran Feb. 19, 2016) (autism not caused by influenza vaccine), *aff'd* 2016 WL 3647786 (Fed. Cl. June 2, 2016); *Cunningham v.*

There is now, therefore, a serious question concerning whether it is reasonable for additional Vaccine Act petitioners to continue to pursue highly speculative theories concerning vaccinees with autism spectrum disorders.  In each such case, of course, a case-specific decision must be made concerning if and when it became unreasonable, under all the circumstances of the case, to continue to go forward.  In many of the cases decided since 2010, like *Holt*, petitioners have tried to avoid the conclusions of the test cases by alleging that a child suffered a vaccine-caused "encephalopathy" that resulted in "autistic-like features," or that a child had an underlying "mitochondrial disorder" that somehow made the child more vulnerable to injuries by vaccines, or that an "autoimmune" process was involved.  *See Holt*, 2015 WL 4381588, at *3 (for Special Master Vowell's discussion of this trend).  But all such cases, in essence, have amounted to attempts to prove that vaccines can cause or aggravate *symptoms of ASDs*.  And, except for two highly unusual Table Injury cases,[16] all such theories have been *rejected*.

Further, a review of the post-"test case" decisions enumerated *supra* in note 16 demonstrates that those cases typically involved expert witnesses who were quite underqualified to opine on the vaccine-causation issues at hand, and/or presented theories with no substantial scientific merit, and/or disregarded the facts contained in the medical records of the case.

Accordingly, despite my finding of reasonable basis in this case, I hereby put counsel, *especially in autism-related cases*, on notice, once again, that if counsel continue to go forward with such extremely weak cases, I (and other special masters) am *not* likely to find that there was a reasonable basis for the filing or for the continued prosecution of these cases.  (*See also Wilson v. HHS*, No. 15-551V, 2017 WL 877278, at *6 n.14 (Fed. Cl. Spec. Mstr. Feb. 10, 2017).

---

*HHS*, No. 13-483V, 2016 WL 4529530 (Fed. Cl. Spec. Mstr. Hastings Aug. 1, 2016) (autism not caused by MMR vaccine), *aff'd*, 2017 WL 1174448 (Fed. Cl. Jan. 25, 2017); *T.M. v. HHS*, No. 08-284V (Fed. Cl. Spec. Mstr. Corcoran Aug. 9, 2016) (not yet published) (autism not caused by DTaP vaccine), *aff'd*, 2017 WL 3184726 (Fed. Cl. 2017); *Anderson v. HHS*, 02-1314V, 2016 WL 8256278 (Fed. Cl. Spec. Mstr. Corcoran Nov. 1, 2016) (autism not caused by MMR vaccination), *aff'd*, 2017 WL 1787975 (Fed. Cl. May 5, 2017).

[16] In *Poling v. HHS*, the presiding special master clarified that the family was compensated because the Respondent conceded that the Poling child had suffered a *Table Injury--not* because the Respondent or the special master had concluded that any vaccination had contributed to causing or aggravating the child's ASD.  *See Poling v. HHS*, No. 02-1466V, 2011 WL 678559, at *1 (Fed. Cir Spec. Mstr. Jan. 28, 2011) (a fees decision, but noting specifically that the case was compensated as a Table Injury).

Second, in *Wright v. HHS*, No. 12-423V, 2015 WL 6665600 (Fed. Cl. Spec. Mstr. Sept. 21, 2015), Special Master Vowell concluded that a child, later diagnosed with ASD, suffered a "Table Injury" after a vaccination.  However, she stressed that she was *not*  finding that the vaccinee's ASD in that case was "caused-in-fact" by the vaccination--to the contrary, she specifically found that the evidence in that case did *not* support a "causation-in-fact" claim, going so far as to remark that the petitioners' "causation-in-fact" theory in that case was "absurd." *Wright v. HHS*, No. 12-423V, 2015 WL 6665600, at *2 (Fed. Cl. Spec. Mstr. Sept. 21, 2015).

IX

CONCLUSION

For the foregoing reasons, I award $45,232.46 as follows:

**A lump sum of $45,008.61 in the form of a check payable jointly to Petitioner and Petitioner's counsel, Andrew D. Downing, Esq., on account of services performed and costs incurred by counsel's law firms.**

**A lump sum of $223.85 in the form of a check payable to Petitioner.**

The clerk of the court shall enter judgment in accordance herewith.[17]

**IT IS SO ORDERED.**

/s/ George L. Hastings, Jr.
George L. Hastings, Jr.
Special Master

---

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.